## GOODRICH vs. THE CITY OF MILWAUKEE.

*Trusts. — Liability of city to lot-owner. — Estoppel in pais. — Construction of statutes : old and new remedies.*

1. By our statute " Of Uses and Trusts " (ch. 84, R. S.), *active* trusts, lawful before the statute, may still be created, subject to the limitations as to *time* prescribed in title XV. *White v. Fitzgerald* (19 Wis. 487) followed ; and *Marvin v. Titsworth* (10 id. 320) overruled.

2. Where lands were conveyed to A., to have and to hold to him, his heirs and assigns, " in trust for the sole use and benefit of B., her heirs and assigns forever, i. e., in trust for said A. to bargain, sell and convey, and to lease and demise, said premises, and to mortgage the same as he may be directed by said B. in writing," and to pay over to her the proceeds, or re-invest them as directed by her from time to time : *Held*, that this was an active trust, and valid ; and the trustee might sue in his own name alone. R. S. ch. 122, § 14.

3. The charter of Milwaukee (in 1852) required the council to make a survey of the streets, etc., and, as soon as practicable thereafter, to cause the grade of *all* streets to be established, and cause profiles thereof to be made and filed, etc., and provided, that should the grade so established be afterward altered, the city should be liable to lot owners for

---

resulting damages. In 1853, and again in 1861, special ordinances were passed, fixing the grade of a certain street, and requiring adjoining lot-owners to pave upon such grade. *Held*, that the city was liable to a lot-owner for injuries to his lot resulting from a subsequent change of grade, though it had never complied *generally* with the charter by fixing the grade of *all* the streets.

4. *It seems* that the city could not have set up its own neglect to defeat the action, even if the ordinances of 1853 and 1861 had not expressly declared (as they did) the grades fixed by them to be *permanent*.

5. Where the grade of a street commencing at Milwaukee river in said city was determined in the ordinance only by stating its height above the base line at the middle of each intersecting street thereon, and the city caused the street *between the river and the first cross street* to be paved *on the same grade* as that fixed for the middle of such cross street: *Held*, that, this being the construction put upon the ordinance by the city itself, without objection, and being a reasonable one, the city was estopped from denying its correctness to the injury of the lot-owners.

6. Remedies existing, whether by common law or statute, will not be regarded as taken away by subsequent statutes granting new remedies, unless such a purpose is expressed or *clearly* implied.

7. There is nothing in ch. 117, Laws of 1858, which deprives the lot-owners of Milwaukee of the remedies granted by the charter, in case of damage to lots from a change in the grade of a street.

APPEAL from the Circuit Court for *Sheboygan* County.

Action for injuries to certain lots in the city of Milwaukee, resulting from changes in the grade of East Water street, in said city, upon which said lots front. Plaintiff sued as trustee of Mary H. Belcher, claiming under a deed executed to him by one Eli Hunter in 1860, whereby said Hunter grants, etc., the premises described to said *Goodrich*, "his heirs and assigns forever, to and for the use of the said Mary H. Belcher, her heirs and assigns,". "to have and to hold the said premises and appurtenances to the said party of the second part, his heirs and assigns, in trust for the sole use, benefit and behoof of the said Mary H. Belcher, her heirs and assigns forever, that is to say, in trust to the said party of the second part to bargain, sell and convey, and to lease and demise, the said premises, and to mortgage the

same, as he may be directed to do by the said Mary H. in writing, and to pay over to the said Mary H., taking her individual receipt therefor, all moneys arising or to arise from the said property, whether from the rents or from the sale or mortgaging thereof, or to re-invest the same as the said Mary H. may from time to time direct in writing." This deed was received in evidence on the trial of the action, against defendant's objection.

Secs. 16 and 18, ch. 10 of the revised charter of Milwaukee, which took effect in March, 1852 (Laws of 1852, ch. 56), are as follows: "Sec. 16. The common council shall, at its first meeting, appoint five commissioners, one from each ward, who, with the assistance of the city surveyor, or such other assistant surveyors as the council may appoint, shall cause a new and accurate survey to be made of the lines and boundaries of all the streets, alleys, sidewalks, public grounds, wharves and blocks, and shall cause to be established such permanent landmarks as they shall deem necessary, and cause an accurate plat or plats thereof to be made and certified to by the said surveyor and commissioners, which shall be filed in the office of the city surveyor, and a copy thereof shall be recorded in the office of the register of deeds of Milwaukee county." "Sec. 18. As soon as practicable after the completion of such survey, the common council shall cause to be established, under the direction of the city surveyor, the grade of all streets, sidewalks and alleys in the said city, and shall cause accurate profiles thereof to be made, one of which shall be filed in the office of the register of deeds of Milwaukee county; and, should the grade so established be at any time hereafter altered, all damages, costs and charges arising therefrom shall be paid by the city to the owner of any lot, parcel or tenement which may be affected or injured in consequence of the alteration of such grade."

Ch. 117, Private and Local Laws of 1858 (which is amendatory of the act above named), after providing for the election of three street commissioners for said city of Milwaukee, further provides as follows: "Sec. 4. Whenever said commissioners shall deem it necessary to grade or otherwise improve any street, alley, public ground or sidewalk, * * * the city engineer shall, under their direction, make an estimate of the cost of such proposed work, as now provided by law, and shall file such estimate in the office of the comptroller." "Sec. 5. * * * If the commissioners shall be of opinion that any lot or parcel of land adjoining the proposed improvement will be directly injured by the proposed grading, beyond the direct benefit therefrom to that lot, they shall assess in favor of such lot or parcel the balance of damage which in their opinion the same will so sustain thereby ; and so soon as said proposed work shall have been done, such balance shall be paid to the owners respectively of the lots or parcels so injured, out of the ward fund of the ward in which the work is done." Sec. 14 provides for an appeal to the common council from the decision of the commissioners, in such assessment of benefits ; and for a further appeal to the circuit court. Said chapter 117 consists of sixty-five sections, relating to various subjects connected with the government of said city ; and by sec. 64, "all acts or parts of acts contravening either the letter or spirit of this act" are declared to be repealed.

On the 3d of March, 1853, the city council passed an ordinance (entitled "An ordinance permanently establishing the grade in certain streets therein described, in the third ward of the city of Milwaukee"), the first section of which is as follows : "The grade or elevation of the several streets hereinafter mentioned, in the third ward of the city of Milwaukee, is hereby determined and permanently established, as follows : Assuming as

a base the level of the Milwaukee river, as it was in March, 1836 [here follow, first, a statement of the manner in which said base was to be determined; and, secondly, the grades of twenty-two streets, including the following:] East Water street: At the middle of Erie st., five feet; at the middle of Chicago st., five feet; at the middle of Buffalo st., five feet; at the middle of Detroit st., six feet; at the middle of Huron st., seven feet; at the middle of Michigan st., nine and a half feet; at the middle of Wisconsin st., twelve feet." It appears that "there were five commissioners appointed" as required by sec. 16 of the charter of 1852, above recited, and that "there were some plats and profiles made and recorded, but all the streets and alleys were not surveyed. The duty was only partially performed, and never has been completed. The plats were not certified to by the commissioners, but recommended by them." It appears further that, by order of the street commissioners, East Water street was graded and paved in 1853, upon the grade established by the ordinance aforesaid.

On the 16th of December, 1861, the city council passed an ordinance, the first section of which declares that the ordinance of 1852 (reciting its title and date) "is hereby amended so that the grade or elevation of the several streets hereinafter mentioned, in the third ward of the city of Milwaukee, shall be, and the same hereby is, determined and permanently established, as follows: Assuming as a base or datum line, the level of the Milwaukee river as it was in March, 1836, * * * East Water street shall be, at the middle of Erie street, nine feet instead of five feet as heretofore; at the middle of Chicago street, nine feet, instead of five feet as heretofore," etc., etc. In 1863 the grade was changed in accordance with this ordinance, and the street again paved by order of the street commissioners. In 1866, the common council passed an ordinance "to fix and

permanently establish the grade of Ferry street in the fifth ward, and East Water street in the third ward, of the city of Milwaukee." The second section is as follows: "The grade of East Water street, in the third ward, is hereby fixed and permanently established as follows: Assuming as a base the level of the Milwaukee river, as it was in the month of March, 1836 — at the south line of Erie street, to be nine feet; at the dock line of Milwaukee river, to be seventeen feet." In pursuance of this ordinance the street was filled, in front of the lots in question, between eight and nine feet.

A witness for the plaintiff testified as follows: "It was usual, in establishing the grade of any street, to give the height only at the intersection of other streets with it, unless there was to be a variation from a direct line between those points. If the grade between the center point of one intersection and the center point of another should be otherwise than a direct line, then at the point where the break should occur the height is given. The survey provided for in section 16 of chapter 10 of the city charter [of 1852] never was made."

The plaintiff proved that each change in the grade of the street, after that made in 1853, diminished largely the value of the property in question. The court, however, on defendant's motion, granted a judgment of nonsuit; and plaintiff appealed.

*James L. Brown*, for appellant, argued, 1. That the act of 1858 did not repeal, by implication, the provisions of the charter of 1852, giving a right of action for injuries resulting from a change of grade; and to the point that the giving of a new remedy does not constitute a repeal by implication of one already provided, he cited *Taylor v. Brown*, 1 Wis. 513, 525; *Meek v. Pierce*, 19 id. 300; *Janesville v. Markoe*, 18 id. 350; Dwarris on Statutes, 673, 674; 7 Bacon's Ab. "Statute," D. 443; *Payne v. Conner*, 3 Bibb, 180; *Brown v. Miller*, 4 J. J. Marsh. 474; *Bruce v. Schuyler*, 4 Gilman,

221–271; *Bowen v. Lease,* 5 Hill, 221; *Goddard v. Boston,* 20 Pick. 407, *Snell v. Bridgewater Co.,* 24 id. 297; *Walworth Co. v. Whitewater,* 17 Wis. 193; *Farmers' Turnpike Road v. Coventry,* 10 Johns. 389; *Wheaton v. Hibbard,* 20 id. 290; *Crittenden v. Wilson,* 5 Cow. 165; *Wetmore v. Tracy,* 14 Wend. 250; *Susquehanna Turnpike Co. v. People,* 15 id. 267. 2. The right of the lot-owner in this form of action has been already sustained by this court. *Goodall v. City of Milwaukee,* 5 Wis. 32; *Pearce v. City of Milwaukee,* 18 id. 428. 3. Counsel also argued that the plaintiff could recover independently of the statute, for such a change in the grade of the street as deprived him of reasonable access to his property. 4. The objection that plaintiff could not bring the action because, by the statute of uses, the whole estate vested in Mrs. Belcher, would not be good even under the decisions in other states, because a restricted power of management in the way of renting, receiving rents, selling, etc., is given to the trustee by the terms of the trust-deed. R. S. ch. 84, sec. 4. But independently of that fact, the trust vests under subd. 5, sec. 7 of that chapter, which is peculiar to the statute of this state, and preserves trusts "fully expressed and clearly defined upon the face of the instrument creating" them. 5. The city is estopped by its own action from claiming that the grade was not established by the several ordinances passed for that purpose. *Codner v. Town of Bradford,* 3 Chand. 291; *Emmons v. Dowe,* 2 Wis. 322; *Melms v. Werdehoff,* 14 id. 19; 1 Phil. Ev. 453, 464–466; Story on Ag. § 127; *Com'rs of Knox Co. v. Aspinwall,* 21 How. (U. S.) 539. 6. If the city, by failure to comply with the charter, had no right to make the grades, it was liable as a tort-feasor.

*D. G. Hooker,* City Attorney (with *J. G. Jenkins,* of counsel), for respondent:

1. Under the deed to plaintiff, the title vested in the *cestui que trust.* That instrument at most created a

special power in trust. Plaintiff is not the "owner" of the premises, within the meaning of the statute allowing damages. R. S. ch. 84, secs. 5–15, and ch. 85, sec. 23 ; R. S. of N. Y. (5th ed.) vol. 3, p. 14 ; *De Peyster v. Clendining,* 8 Paige, 295 ; *Frazer v. Western,* 1 Barb. Ch. 220 ; *In re De Kay,* 4 Paige, 404 ; *Rawson v. Lampman,* 1 Seld. 456 ; *White v. Fitzgerald,* 19 Wis. 480. 2. A municipal corporation is not liable *at common law* for consequential damages to property by reason of improvements for which no part of the property is taken or used. *Radcliff v. The Mayor, etc.,* 4 Coms. 195 ; *Alexander v. Milwaukee,* 16 Wis. 257. ·3. Defendant is not liable under the provisions of the charter of 1852. The grade of the street in front of the premises in question was never permanently established until the ordinance of 1866. And the common council were authorized by the act of 1852 to permanently establish a grade, only after a general survey, which was never made. 4. The act of 1858 provides a special remedy to recover for such damages, and that remedy only can be pursued. *Kimble v. Whitewater Valley Canal Co.,* 1 Carter, 285 ; *Null v. Whitewater Canal Co.,* 4 Ind. 431 ; *N. A. & S. R. R. v. Connelly,* 7 id. 32 ; *Calking v. Baldwin,* 4 Wend. 667 ; *Newcomb v. Smith,* 1 Chand. 71 ; *Stephens v. Marshall,* 3 id. 222 ; *People v. Supervisors Westchester,* 4 Barb. 64 ; *Harrington v. County Commissioners,* 22 Pick. 263 ; *Stowell v. Flagg,* 11 Mass. 364 ; *Stevens v. Proprietors, etc.,* 12 id. 466 ; *Pettibone v. R. R. Co.,* 14 Wis. 443.

DIXON, C. J. By the statute "Of Uses and Trusts" (ch. 84, R. S.), passive trusts are abolished, but active trusts are not. By passive trusts, as here used, we mean those which are express, or created by the words of some deed or other instrument in writing, and not those trusts arising or resulting by implication of law, which, in most instances, still continue to exist, and which

may, in the broadest sense, be denominated passive. Every express passive trust is abolished, and the deed or instrument by which it is created, or attempted to be, takes effect as a conveyance directly to the *cestui que trust*, in whom the legal title vests, and the trustee acquires no estate or interest whatsoever. Such must be held to be the operation of sections three and five of the statute. A conveyance of land from A. to B., to the use of or in trust for C., the trustee having no active duties to perform, constitutes a passive trust, and the trustee takes no title, but the same vests immediately and absolutely in the *cestui que trust* to the extent of the estate granted.

But that active trusts, of whatever kind, provided they be such as were lawful before the passage of the statute, are not abolished by it, nor intended to be, but, subject to the limitations as to time prescribed by the title of which the chapter is a part, may still be created, is manifest by the fifth subdivision of the eleventh section, as also by section six. As was observed in the opinion of this court in *White v. Fitzgerald*, 19 Wis. 487, subdivision five of section eleven is not found in the statute of New York, and first appeared in this state in the Revised Statutes of 1849. The addition of that subdivision to the four which precede it, and which are found in the statute of New York, establishes, as it was undoubtedly intended to do, a policy in this state upon the subject of active trusts entirely different from that which prevails in the state of New York. It shows very clearly that no active trusts were intended to be affected or abolished by any provision of the statute, though the language of some of its sections, literally construed, may be broad enough to include them; but that any such trust may still be created when, in the language of subdivision five, "it is fully expressed and clearly defined upon the face of the instrument creating it."

Upon full consideration, we are satisfied that such is the true construction of the statute. It is certainly the only one by which its various provisions can be harmonized, and effect be given to each. It is sanctioned by *White v. Fitzgerald*, above cited, though not by *Marvin v. Titsworth*, 10 Wis. 320. In the latter case, the New York decisions were followed, and the meaning and effect of subdivision five was overlooked. That case was erroneously decided, and must be overruled.

The declaration of trust in this case, contained in the deed of the land made to the plaintiff, is as follows: "To have and to hold the said premises and appurtenances to the said party of the second part, his heirs and assigns, in trust for the sole use, benefit and behoof of the said Mary H. Belcher, her heirs and assigns forever, that is to say, in trust for the said party of the second part to bargain, sell and convey, and to lease and demise, the said premises, and to mortgage the same, as he may be directed by the said Mary H. in writing, and to pay over to the said Mary H., taking her individual receipt therefor, all moneys arising or to arise from the said property, whether from the rents or from the sale or mortgaging thereof, or to re-invest the same, as the said Mary H. may, from time to time, direct in writing." There can be no doubt that this was the creation of an active trust, and, as such, valid under the statute. The plaintiff, therefore, being the trustee of an express trust, and clothed with the legal title, is authorized to sue in his own name, without joining his *cestui que trust*. R. S. ch. 122, § 14.

The next question we are to consider is, as to the construction to be put upon the ordinance of March 3d, 1853, and the amendatory ordinance of December 16th, 1861, fixing, among others, the grade of East Water street. Was the grade of that part of East Water street extending from Erie street to the river, being a distance of one hundred and twenty feet, or thereabout, along the

line of the block lying between Erie street and river, fixed by those ordinances? The mode of establishing the grade was by fixing it at the points of intersection of the various streets running into or crossing East Water street. Between those points of intersection the grade continued in a straight line from one to the other.

The ordinance of 1853 commenced by fixing the grade, at the middle of Erie street, at five feet above the base line or level established for determining the grades of the various streets throughout the city, and thence proceeded up the street, fixing the grade at the points of intersection of the several cross streets, as far as Wisconsin street. Between Erie street and the river or dock line, where East Water street terminates in that direction, no grade was expressly fixed by the ordinance or the amendment. The premises of the plaintiff are situated upon that part of East Water street. The practical construction put upon the ordinance and the amendment, both by the city authorities and the owners of lots, was, that the grade of that part of the street was fixed—that, from Erie street to the river, it was continued the same as between Erie and Chicago streets, the next intersecting street above Erie. It does not appear that, under the ordinance of 1853, any filling was necessary, but the owners of the lots, including the premises now owned by the plaintiff, were required by the city, and under the direction of its officers, to pave the street with cobble stones, as upon a grade established by that ordinance, and the same was accordingly paved at the expense of the lot owners. And again, after the passage of the ordinance of 1861, amending that of 1853, by raising the grade of East Water street, so that, at the points of its intersection with Erie and Chicago streets, it was nine feet above the base line, instead of five feet, as theretofore established, the same things took place. The lot owners, the plaintiff included, were required by the city authorities to fill to the new grade, and to put down the

Nicholson pavement, and the same were done at their expense.    Under these circumstances, the claim now put forth on the part of the city, that no grade of that part of the street was fixed by the ordinance of 1853, or the amendatory ordinance of 1861, to say the least of it, comes with very bad grace.    It is true that there was nothing in the ordinances going expressly to the point ; but they contained nothing from which a contrary intention could be gathered.    On the other hand, when all the circumstances are taken into consideration, the construction which was given to the ordinances by the city itself seems to have been very reasonable and just, and no doubt that which was intended.    For example, in 1861, when there was an elevation in the grade of four feet, it cannot be supposed that it was the intention to stop short at the middle of Erie street, and thence descend abruptly to the old grade, and so on to the river. The construction which the ordinances received in each case seems to have been correct ; but, if not, it is clearly too late for the city to question its correctness.

Having thus determined that the part of East Water street in controversy was within the ordinances of 1853 and 1861, the next question which arises is as to the effect of those ordinances, when considered with reference to the nature of the grade established by them. Was the grade a permanent one, or merely temporary ? Section sixteen of chapter 10 of the charter passed in 1852 (Laws of 1852, ch. 56, p. 108), provided that the common council should, at its first meeting, appoint five commissioners, one from each ward, who, with the assistance of the city surveyor, or such other assistant surveyors as the council might appoint, should cause a new and accurate survey to be made of the lines and boundaries of all the streets, alleys, sidewalks, public grounds, wharves and blocks, and should cause to be established such permanent land-marks as they might deem necessary, and should cause an accurate plat or

plats thereof to be made and certified to by the said surveyor and commissioners, which should be filed in the office of the city surveyor, and a copy thereof should be recorded in the office of the register of deeds of Milwaukee county. Section seventeen enacted that the survey and land-marks so made and established should be *prima facie* evidence of the lines and boundaries of all streets, alleys, sidewalks, public grounds, wharves and blocks, in all cases in which they should be drawn in controversy, in all courts of this state. Section eighteen declared that, as soon as practicable after the completion of such survey, the common council should cause to be established, under the direction of the city surveyor, the grade of all streets, sidewalks and alleys in said city, and should cause accurate profiles thereof to be made, one of which should be filed in the office of the register of deeds of Milwaukee county; and should the grade so established be at any time thereafter altered, all damages, costs and charges arising therefrom should be paid by the city to the owner of any lot or parcel of land, or tenement, which might be affected or injured in consequence of the alteration of such grade. It is under this section that the present action is brought to recover damages sustained by the plaintiff by reason of a change of the grade at the dock line, and adjoining the premises of the plaintiff, made in pursuance of an ordinance passed on the 2d day of October, 1866. The grade was raised at that point to seventeen feet above the base line, instead of nine as theretofore established. Upon this state of case the question is, whether the grade established by the previous ordinances, to which the lot owners made no opposition, is to be regarded as permanent, or only temporary. In behalf of the city, it is claimed that it was only temporary; and, in support of this claim, it is insisted that no action was ever taken by the common council to cause surveys to be made and permanent grades to be established, as required by the

provisions of the charter above set forth.   According to the position of counsel in argument for the city, even the ordinance of 1866 does not establish any permanent grade.   It was a special ordinance for that part of East Water street in controversy, and for a portion only of Ferry street, on the opposite side of the river.   On the other side it is argued, even though the common council may never have taken any formal steps toward completing the surveys and causing the grade of the streets, sidewalks and alleys to be permanently established, yet the city ought not to be permitted, to the great detriment and injury of the proprietors of adjoining lots, to take advantage of its own neglect or failure to perform a duty so plainly imposed upon it.   We are inclined to the opinion that this position is well taken, and should be sustained.   The duty imposed upon the common council in this respect by the charter of 1852 was clear and specific.   The statute was imperative.   It imposed a present duty, and not one the performance of which might be postponed for years.   The common council was to appoint the commissioners *at its first meeting* under the charter ; and, *as soon as practicable* after the completion of the survey, the grade of the streets, sidewalks and alleys was to be established under the direction of the city surveyor.   The words " as soon as practicable," may imply some discretion as to time on the part of the common council.   They mean, as soon as it was a convenient or proper time for the city surveyor to perform the work.   He was not to be required to do it at an inclement or unsuitable season of the year, as, for example, in the winter season, when such work might not be conveniently done.   But, aside from such causes for delay as these, the work was to be done and the grade established at once.   Such was the evident meaning of the statute ; and when the purpose of the requirement is considered, it seems very obvious that the city cannot be allowed to avail itself of its own

wrong, or of the failure of the common council to per-
form its duty. The great damage so often caused to
private property in our large towns and cities by changes
in the grade of streets in front of it, either by the dig-
ging down or the filling up of such streets for the greater
convenience of the public, was well known. It was well
known that such changes were frequently attended with
a loss of almost the entire value of the adjoining prop-
erty ; that estates were ruined, and buildings and im-
provements costing large sums of money were rendered
worthless ; and yet, that the law afforded no means of
redress or compensation to the owners. It was to pre-
vent, so far as might be consistently with the conven-
ience and welfare of the public, such disastrous conse-
quences as these to the property of individuals, that
the provisions in question were introduced into the
charter. By the early establishment of the grade of
the streets, the owners of property upon them could
conform to it in the erection of their buildings, and in
making other expensive and permanent improvements ;
and if the grade was afterward changed, they were
assured that it would not be done by sacrificing their
property, but that compensation would be made by the
public, for whose benefit and convenience the change
was required, and upon whom the loss ought, in justice
and equity, to fall. With this understanding of the
object of the statute, that it was a requirement wisely
and cautiously interposed for the protection of private
rights and private property, we do not see how the city
can for a moment stand upon the plea that such duty
has never yet been performed.

But there is still another ground on which the answer
of the city in this behalf must be rejected. The ordi-
nance of 1853, and the amendatory ordinance of 1861,
both recited that they were passed for the purpose of
*permanently* establishing the grade of the street in
question. They indicate, on their very face, that it was

the intention of the common council passing them to comply, as far as it was possible by ordinances in that form, with the requirements of the charter of which we have been speaking. If the common council did so intend, as we must presume from the language of the ordinances, and if third parties, acting upon the intention thus expressed, have so conducted themselves that they would suffer great injury by the opposite construction, ought not the city to be estopped, even though the ordinances may be insufficient as a complete performance of the duty imposed by the charter? It seems to us, as well on this ground as on that above stated, that the doctrine of estoppel *in pais*, if applicable at all to public corporations, as we know it is, should certainly be applied in a case like this. It seems to us, furthermore, that the partial performance, indicated by these ordinances, of the duty imposed upon the common council, should not be defeated or avoided on the part of the city by an attempt to show that the whole duty has not been performed. The city cannot, under the circumstances, make the objection.

The next and last question to be examined is as to the effect of section five of chapter 117, Laws of 1858, amending the charter of the city. In *Goodall v. Milwaukee*, 5 Wis. 32, an action like the present to recover damages was sustained upon the provisions of an ordinance of the city promising indemnity for injuries caused to private property by reason of the alteration of the grade of a street, as fixed by that ordinance. In *Pearce v. Milwaukee*, 18 Wis. 428, a similar action was sustained upon the provisions of the charter on which this action was brought. In the latter case, it was not suggested that the action would not lie, or that any other remedy was provided by statute. It is now contended, however, that a specific remedy is given by chapter 117, above referred to. A recital of the provisions of that act is unnecessary. It is enough to say that it contains nothing inconsistent

with the idea that the common law remedy, by action arising upon the provisions of the charter, is still to continue. No intention is manifested to abrogate or take away such remedy. Repeals by implication are not favored in the law, especially with regard to previously existing remedies, whether by statute or common law, as to which it is held that they will not be taken away without a negative expressed or clearly implied. The act contains no express or negative words, is in terms applicable to streets, alleys, etc., which are to be graded for the first time, and the remedy given by it cannot be extended so as to cut off the right of action at law which existed in cases of this nature before the act was passed.

For these reasons, the judgment of the court below must be reversed, and the cause remanded for a new trial according to law.

*By the Court.*—So ordered.